SWENSON *v.* MAHOPAC IRON ORE CO.

(*Common Pleas of New York City and County, General Term.* June 3, 1889.)

APPEAL—REVIEW—WEIGHT OF EVIDENCE.

Where a workman is killed by a rock falling from the roof of a chamber in a mine, and in an action against the mine owner therefor the evidence is conflicting as to whether the roof was properly supported, and whether the deceased knew of its condition, a verdict for plaintiff will not be disturbed on appeal.

Appeal from trial term.

Action by Anna Swenson, as administratrix of Anders Swenson, deceased, against the Mahopac Iron Ore Company. Judgment for plaintiff. Defendant appeals.

Argued before LARREMORE, C. J., and ALLEN and BOOKSTAVER, JJ.

*Wm. C. Holbrook*, for appellant. *J. Edw. Swanstrom*, for respondent.

ALLEN, J. The action was brought by the plaintiff, as administratrix of Anders Swenson, to recover damages occasioned by the death of said Swenson through the alleged negligence of the defendant. The only questions raised by the exceptions taken by the defendant in the case are whether the evidence as to the negligence of the defendant was sufficient to take the case to the jury,

and whether a question of fact was presented to the jury by the evidence as to the contributory negligence of the plaintiff.

The defendant is a mining corporation owning and operating an iron mine in Putnam county, in the state of New York, near Lake Mahopac. The plaintiff's intestate, at the time of the accident, was in the employment of the defendant as a workman in its mines. On the morning of the 11th of December, 1886, the deceased and one Charles Ericksen were sent into shaft No. 1 by Mr. Lewald, the foreman of the mine, to fix the track used in hoisting ore. They repaired the track, and were waiting to have a skip hoisted to see if the track was all right. Ericksen testified: "We had to wait there until the skip went over once or twice to see if the track was done." While thus engaged the defendant was killed by a large rock, which fell from the roof of the mine. The accident occurred in a subterranean chamber, which formed a part of shaft No. 1. This chamber was from 15 to 20 feet wide, and 30 feet long. Shaft No. 1 was a sloping tunnel, which opened into the chamber and continued beyond it. There was a stull which had been erected by the company in the chamber, and the deceased and Ericksen seated themselves between this stull and the pump, and close to the pump, to see how the skip would run over the track.

The general principles of law applicable to this case—to-wit, that it was the duty of the defendant to furnish a safe and proper place for its servant in which to prosecute his work, to adopt all reasonable means and precautions for his safety, and to employ skillful and competent workmen to direct his labor and assist in the performance of his work, and that this duty on defendant's part could not be delegated by him to any servant, so as to exonerate him from responsibility to another servant who has been injured by its non-performance, and that the risks of the service which a servant assumes on entering the employment of a master are those only which occur after the due performance of the duties which the law enjoins upon him—are not in dispute. In *Pantzar* v. *Mining Co.*, 99 N. Y. 375, 2 N. E. Rep. 24, it is said to be the rule that it is proper to inquire, in a case of this class, whether the master did everything which, in the exercise of reasonable and ordinary care and prudence, he ought to have done. Did he omit any precautions which a prudent and careful man would take or ought to have taken? It becomes necessary, therefore, to examine the testimony to ascertain whether there was any evidence before the jury upon which it might find that the defendant failed in its duty of reasonable and ordinary care in examining and inspecting this part of the mine, and in omitting to take the ordinary and usual precautions to prevent accidents to workmen.

It is claimed on the part of the defendant that work in the chamber where the accident happened had been abandoned, and therefore it was relieved of its duty to make as frequent inspection and tests to prevent the fall of rock at that point as where work was being done. As to whether mining operations were carried on in that chamber at the time of the accident there seems to be a conflict of evidence. Case, one of the defendant's witnesses, testifies that mining operations were being carried on there at the time of the accident. Townsend, another witness, testifies to the same effect; while others on the part of the defendant have sworn that no mining operations were going on there at the time. Ericksen, the plaintiff's witness, says: "It was a place where we worked and stopped, and worked again and stopped." As to the condition of the roof from which the stone fell, the witness Ericksen testified: "This roof was loose and cracked. I don't know how long it was in that condition before the accident; that was there a long time, because I could not gauge the time; it was three months anyway." Again he says: "I know it to be the fact that the roof where the accident occurred was cracked and loose, and had been in that condition for a long time. I came down there one time when Tom Roach was working, and I looked out and says, 'Mr.

Roach, why don't you have this roof fixed?' He says, 'I don't have anything to do with that?' This was for that place where that accident occurred,— where that was loose." "*Question*. What kind of a crack was this in the roof? *Answer*. Well, there was this water where the water comes through the crack,—the red stuff. You can see cracks all over this light stuff all over the roof." Another witness, Anderson, was asked how much of the roof was cracked, and he answered, "So far as I examined it, it was cracked all over the place where Swenson was killed." Wilson, another witness, testified that he worked there five days before Swenson was killed, and, when asked to state the condition of the roof of the mine at that time, he said it was a bad piece of ground, and that he didn't work there afterwards. Ericksen also testified that after he observed this condition of the roof, before the accident, he told Mr. Roach, the contractor, and also his hired man, and he saw Mr. Case, the foreman, and Mr. Lewald, who was the head mine boss at the point where the cracks were. The witness Nye, an owner of mines, and who has been engaged in the mining business as superintendent and otherwise since 1863, was examined as an expert, and was asked: "*Question*. Where there is loose rock in the roof, and cracks appear in the roof of a mine, what does that indicate from your experience? *Answer*. Danger; danger to human life, and necessity of timbering; danger from the falling of the loose rock in the roof." As indicating that the defendant had knowledge of the condition of the roof, it was shown that they commenced about two or three months before the accident to put in timber supports, which are called in mining stulls. Two timbers only appear to have been put in before the accident, and Ericksen swears that these timbers were three and a half to four feet apart at one end, and a little wider at the other, and there was about ten feet of the roof that was cracked and broken that was not covered by these two timbers. The witness Nye, when asked of what use two timbers would be in a chamber 30 feet long and 15 to 20 feet wide, with its roof cracked covering a space of 10 to 15 feet, answered, "Very small use, very limited, to the extent only of the ground covered." There is evidence that 8 to 10 timbers would be necessary to put in the chamber to cover the area of cracked roof, assuming the area of cracked and loose roof to be as sworn to by plaintiff's witnesses. As to the examination and inspection of this chamber, Roach testifies that it was a part of his contract to inspect the mine and see that everything was correct, and says, "Between August and September I did not inspect the roof of that chamber." It also appears from the testimony of Case, who had charge of the defendant's mining operations, that he made some soundings in the fall of 1886, but none at that point where the accident happened; that he sounded that part in August, and has no recollection of having sounded it between August and December. The defendant's witnesses contradicted the plaintiff's evidence in regard to this condition of the roof of the chamber, and gave proof on the subject of the precautions taken by the defendant to prevent accidents in the chamber. Townsend, the defendant's timberman, swore that he put up the stull in question, and took the usual precautions, and that the ground in that chamber was not dangerous. Another witness testified that the stull was constructed in the usual way, and that he never noticed anything particular about the character of the roof. Roach, a miner, said that he excavated the chamber; that the hanging walls were perfectly solid, the only loose rock being on the roof over the stull; that he was never in a safer mine, and that it was not necessary to put in more timbers than were put in to protect the roof. Another witness examined the roof immediately after the accident and found it solid, save the hole where the rock came from that struck the deceased. The foreman of the mine testified that he considered the chamber safe, although there might have been some small water seams or fissures; that there was nothing of an unsafe condition at the point where the accident occurred on the hanging wall side; that it was sounded in September. Case, the superin-

tendent, swore that he considered the chamber sound and safe; that he examined the roof to see if it was apparently secure; that he saw no necessity of putting in any more timbers.

From an examination of this evidence it plainly appears that it is contradictory upon every important fact bearing upon the defendant's negligence. The evidence as to the condition of the roof at the time of the accident, the evidence as to the defendant's knowledge of this condition, and as to the amount of examination and inspection of the mine, and as to the character and extent of the precautions adopted to protect the roof, was conflicting, and raised questions within the province of the jury to determine, and made it the duty of the court to submit the question of the defendant's negligence to the jury. There was evidence upon which the jury might have found, and undoubtedly did find, that the roof was in a dangerous condition; that this condition was known to the defendant, or would have been known to it if it had exercised the duty of examination and inspection which the observance of reasonable care and prudence imposed upon it; and that "those precautions which would have prevented the injury were not adopted, although they were practicable and of easy and safe application." No error seems to have been committed on this branch of the case.

The proposition that the accident was due to the negligence of a co-servant of the deceased, because the stull heretofore referred to was constructed by his co-servants, is untenable. The accident was not owing to any defect in the construction of the stull, but to a fault in the roof of the mine outside of the part protected by the stull.

There is evidence in the case bearing upon the question of contributory negligence on the part of the deceased. One witness swears that when he was ordered to go in shaft No. 1 Swenson said that he didn't care about going in that place because it was very dangerous there. There is the evidence of several witnesses to the effect that the deceased was never in the chamber previous to the accident. On the other hand, other witnesses testify that he had been down there. It is also shown that if he had taken a different position than the one which he did take beside the track, or had gone under the stull, or had returned to the surface without waiting for the hoisting of the skip, he would have avoided the accident. This evidence presented a question of fact for the jury, and it was submitted to them by the trial judge in a very clear manner in his charge, where he says: "They insist upon it that there was contributory negligence on the part of the plaintiff's intestate, because he was not working or was not standing at the track or in the track at the time the accident occurred, or was not engaged in fixing the track; that he had got through his work and was taking up his own time, or was amusing himself to suit himself at the time,—in other words that he was not doing his work there. I leave that to you to say whether the place where the plaintiff went to or what he was doing at the time was ordinarily in the line of his duty as a workman at the time, or whether he had got through his duty and was engaged for himself, and not for the defendant, or whether his deviation from the point in which the structure was placed for protection was an act of negligence on his part. There is also evidence that he stated that this shaft was dangerous some time before. What he meant by that, whether he referred to the roof on this part of the timber, I think the evidence does not show, but you are entitled to take that into consideration, and his means of knowledge. Of course a workman has got to look out for the place where he goes. If there is anything obvious to ordinary inspection that any other person could see by looking, then he is chargeable with negligence if he sees it, and, notwithstanding that, continues his work there. Was there a danger of such a character, and would the exercise of reasonable care on the part of the workman have developed, when he went down there, that there was likely to be a fall of rock? If so, then he was negligent, and unless he is wholly free from

blame, his administratrix cannot recover." The judgment and order should be affirmed, with costs.

BOOKSTAVER, J., concurs.